**NORMA A. AGUILAR**
Federal Defenders of San Diego, Inc.
California State Bar No. 211088
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
E-Mail: norma_aguilar@fd.org

Attorneys for Mr. Scilagyi,

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE MARILYN L. HUFF)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 08CR0447-MLH |
| ) | |
| Plaintiff, ) | DATE: APRIL 1, 2008 |
| ) | TIME: 2:00 P.M. |
| v. ) | |
| ) | MEMORANDUM OF POINTS AND |
| SCOTT STEVEN SCILAGYI, ) | AUTHORITIES IN SUPPORT OF |
| ) | DEFENDANT'S MOTIONS |
| Defendant. ) | |
| ) | |
| ) | |

**STATEMENT OF FACTS**[1]

December 7, 2007 at 4:15 p.m. Mr. Scilagyi entered the United States through the San Ysidro, California Port of Entry. Mr. Scilagyi was accompanied by a passenger, identified as Jennifer Martinez. Ms. Martinez advised the primary inspector that she lost her identification card. The primary inspector referred them to secondary inspection.

At secondary inspection, a narcotics detector dog alerted to the ashtray of the vehicle. Inspector's located cigarette buts, which smelled of marijuana. Both Mr. Scilagyi and the passenger were taken into secondary inspection and patted down. As the officers continued the search of the vehicle, they also located a handgun wrapped in white towel. The handgun was located in between the driver's seat and the front

---

[1] Unless otherwise stated, the "facts" referenced in these papers come from government-produced discovery that the defense continues to investigate. Mr. Scilagyi does not admit the accuracy of this information and reserves the right to challenge it at any time.

1

1  center console. A further search also yielded a baggy containing 18 grams of marijuana.

2  Mr. Scilagyi was interrogated after allegedly being advised of his Miranda rights. He denied

3  knowledge of the presence of the handgun in the car.

4  The Grand Jury returned an indictment against Mr. Scilagyi, charging him with Felon in Possession

5  of a Firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), Importation of Marijuana, in violation

6  of 21 U.S.C. § 952/960 and 840 and Bail Jumping, in violation of 18 U.S.C. § 3146.

**I.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS*.**

**A.   Introduction**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

---

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam). Mr. Scilagyi has already moved to dismiss under these cases, but has acknowledged that the rulings in them did not support his position. Having actually read the 2007 instructions, Mr. Scilagyi now believes that those cases do not permit the excesses here.

[3] See also id. at 20 ("You're all about probable cause.").

1  be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict

2  because the grand jurors disagree with a proposed prosecution.

3  Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

4  to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9.[4] Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See id. at 20.[5]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).[6] The district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See id. at 27.

This motion follows.

**B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

---

[4]   Counsel has ordered the grand jury selection transcript. Counsel understands that the court reporter has refused the prepare the transcript. This Court should order that the transcript be prepared. Because Fed.R.Crim.P. 6 permits challenges to grand jurors by the parties, the selection process cannot be secret. At any rate, this Court should also order disclosure under rule 6(e).

[5]   These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.

[6]   The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord Navarro-Vargas I, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial."). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even '"where a conviction can be obtained."'

---

[7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

2  the grand jury's attributes in  Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

3  "controls not only the initial decision to indict, but also significant questions such as how many counts to

4  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

5  a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).

6        Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

7  majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has

8  established probable cause that this individual has committed a crime."  *See* id. at 1214 (Hawkins, J.

9  dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); Marcucci, 299 F.3d at

10  1166-73 (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support

11  in the Ninth Circuit.  But not in Judge Burns' instructions.

12  **C.**  **The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez*
        and *Navarro-Vargas II*.**

13

14        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

15  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

16  decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

17  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

18  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

19  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

20  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

21  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

22  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American*

23  *Diction and Language Guide* 1579 (1999) (brackets in original)).

24        The debate about what the word "should" means is irrelevant here; the instructions here make no

25  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

26  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

27  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

28  indicting even though I think that the evidence is sufficient'...."  See  Ex. A at 8-9.  Thus, the instruction

1   flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No
2   grand juror would read this language as instructing, or even allowing, him or her to assess "the need to
3   indict." Vasquez, 474 U.S. at 264.

4       Nor does the Navarro-Vargas II majority's faith in the structure of the grand jury a cure for the
5   instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its
6   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its
7   decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may
8   have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it
9   independent." Id. at 1202 (emphases in the original).

10      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the
11  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability
12  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The
13  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond
14  making a probable cause determination ... unconstitutionally undermines the very structural protections that
15  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law
16  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that
17  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described
18  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors
19  erroneous instructions because nothing will happen if they disobey them." Id.

20      In setting forth Judge Hawkins' views, Mr. Scilagyi understands that this Court may not adopt them
21  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.
22  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

23      Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban
24  on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,
25  and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

26      Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states
27  they enjoy. He also apparently excused prospective grand jurors who might have exercised that Fifth
28  Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

1  principle...." See Ex. A at 8. The structure of the grand jury and the secrecy of its deliberations cannot
2  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the
3  conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a
4  grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches
5  of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d
6  1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on
7  their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,
8  here, Judge Burns has both fashioned his own rules and enforced them. The instructions here are therefore
9  structural error. See Navarro-Vargas II, 408 at 1216-17 (Hawkins, J., dissenting).  The indictment must be
10 dismissed.

11 **D.    The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.**
12

13      In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,
14 argued that the federal courts should exercise their supervisory power to order prosecutors to disclose
15 exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment
16 common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory'
17 judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority
18 "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct
19 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this
20 Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it
21 does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id.
22 at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own
23 initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's
24 claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.
25      Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would
26 present to them evidence that tended to undercut probable cause. See Ex. A at 20.

27
28

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.
(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
(3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## II.

### ANY STATEMENTS MADE BY MR. SCILAGYI SHOULD BE SUPPRESSED

Mr. Scilagyi was interrogated on a video-taped statement.[8]

A.   The Government Must Demonstrate Compliance With *Miranda*.

   1.   *Miranda* Warnings Must Precede Custodial Interrogation.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also Berkemer v. McCarty, 468 U.S. 420, 428 (1984) (restating Miranda principles).  Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  Id.  See Orozco v. Texas, 394 U.S. 324, 327 (1969).

Mr. Scilagyi was in custody when interrogated.  Once a person is in custody, Miranda warnings must be given prior to any interrogation.  See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (to trigger the Miranda requirement not only must probable cause exist but also a person must reasonably believe that he is not free to leave).  Those warnings must advise the defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990).  If a defendant indicates that

---

[8]   The Government has not yet produced a copy of the video-taped statement.

he wishes to remain silent or requests counsel, the interrogation must cease. Miranda, 384 U.S. at 474. See also Edwards v. Arizona, 451 U.S. 477, 484 (1981). Here, there were no such Miranda rights given at the field.

B.        Mr. Scilagyi's Statements Were Involuntary.

Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived of due process of law if his conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the burden of proving that a confession is voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 483 (1972).

In order to be voluntary, a statement must be the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

A confession is deemed involuntary if coerced by physical intimidation or psychological pressure. Townsend v. Sain, 372 U.S. 293, 307 (1963). "The test is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Accord United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981). The government bears a heavy burden in demonstrating that a confession is voluntary and the finding of voluntariness "'must appear from the record with unmistakable clarity.'" Davidson, 768 F.2d at 1270. Here, such a finding cannot be made.

C.        This Court Should Conduct An Evidentiary Hearing.

This Court should conduct an evidentiary hearing to determine whether Mr. Scilagyi's statements should be admitted into evidence, if any such statements exist. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Scilagyi are voluntary. In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Scilagyi understood the nature of the charges against him and whether he understood his rights. Without evidence, this Court cannot adequately consider these statutorily mandated factors.

1    Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

## III.

## MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE

Mr. Scilagyi moves for the production by the government of the following discovery and for the preservation of evidence. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any government agency. See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1) The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

(2) Arrest Reports, Notes and Dispatch Tapes. The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced in their entirety, be turned over to him. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. This is all discoverable

under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963).  See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968).  Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(i).  Preservation of rough notes is requested, whether or not the government deems them discoverable.

(3) Brady Material.  Mr. Scilagyi requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  Impeachment as well as exculpatory evidence falls within Brady's definition of evidence favorable to the accused.  United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

(4) Any Information That May result in a Lower Sentence Under The Guidelines.  As discussed above, this information is discoverable under Brady v. Maryland, 373 U.S. 83 (1963).  This request includes any cooperation or attempted cooperation by the defendant, as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  Also included in this request is any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, or any other application of the Guidelines.

(5) The Defendant's Prior Record.  Evidence of prior record is available under Fed. R. Crim. P. 16(a)(1)(B).  Counsel specifically requests a complete copy of any criminal record.

(6) Any Proposed 404(b) Evidence.  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests that such notice be given three weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

(7) Evidence Seized.  Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(C).

(8) Request for Preservation of Evidence.  The defense specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession,

1  custody, or care of the government and which relate to the arrest or the events leading to the arrest in this
2  case be preserved. This request includes, but is not limited to, <u>all persons who were apprehended as</u>
3  <u>passengers in the van at issue in the instant case</u>, the results of any fingerprint analysis, the defendant's
4  personal effects, the vehicle, and any other evidence seized from the defendant or any third party. It is
5  requested that the government be ordered to <u>question</u> all the agencies and individuals involved in the
6  prosecution and investigation of this case to determine if such evidence exists, and if it does exist to inform
7  those parties to preserve any such evidence.

8         (9) <u>Tangible Objects</u>. The defense requests, under Fed. R. Crim. P. 16(a)(1)(C) the opportunity
9  to inspect and copy as well as test, if necessary, all other documents and tangible objects, including
10 photographs, books, papers, documents, photographs of buildings or places or copies of portions thereof
11 which are material to the defense or intended for use in the government's case-in-chief or were obtained from
12 or belong to the defendant. Specifically, Mr. Scilagyi requests a copy of the videotape interview of the
13 material witness, if one exists.

14        (10) <u>Evidence of Bias or Motive to Lie</u>. The defense requests any evidence that any
15 prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or
16 distort his or her testimony. <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987); <u>United States v. Strifler</u>, 851 F.2d
17 1197 (9th Cir. 1988).

18        (11) <u>Impeachment evidence</u>. Mr. Scilagyi requests any evidence that any prospective
19 government witness has engaged in any criminal act whether or not resulting in a conviction and whether
20 any witness has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613. Such
21 evidence is discoverable under <u>Brady v. Maryland</u>, supra. <u>See</u> <u>United States v. Strifler</u>, 851 F.2d 1197 (9th
22 Cir. 1988) (witness' prior record); <u>Thomas v. United States</u>, 343 F.2d 49 (9th Cir. 1965) (evidence that
23 detracts from a witness' credibility).

24        (12) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defense requests
25 any evidence that any prospective witness is under investigation by federal, state or local authorities for any
26 criminal conduct. <u>United States v. Chitty</u>, 760 F.2d 425 (2d Cir. 1985).

27        (13) <u>Evidence Affecting Perception, Recollection, Ability to Communicate</u>. Mr. Scilagyi
28 requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any

prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

(14) Witness Addresses. The defense requests the name and last known address of each prospective government witness. See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979)) (defense has equal right to talk to witnesses). The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness. United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

(15) Name of Witnesses Favorable to the Defendant. Mr. Scilagyi requests the name of any witness who made any arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d 1164, 1168 (6th Cir.), cert. denied, 439 U.S. 883 (1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086 (1980).

(16) Statements Relevant to the Defense. Mr. Scilagyi requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert. United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982). This would include Grand Jury transcripts which are relevant to the defense motion to dismiss the indictment.

(17) Jencks Act Material. The defense requests all material to which Mr. Scilagyi is entitled pursuant to the Jencks Act, 18 U.S.C. § 3500, reasonably in advance of trial, including dispatch tapes. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963).

(18) Giglio Information. Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, expressed or implied, made to any government witnesses,

in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

(19) <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(D), the defendant requests the reports of all tests and examinations conducted upon the evidence in this case. Including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

(20) <u>Henthorn Material</u>. The defense requests that the prosecutor review the personnel files of the officers involved in his arrests, and those who will testify, and produce to him any exculpatory information at least two weeks prior to trial and one week prior to the motion hearing. <u>See</u> <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991). In addition, he requests that if the government is uncertain whether certain information is to be turned over pursuant to this request, that it produce such information to the Court in advance of the trial and the motion hearing for an <u>in camera</u> inspection.

(21) <u>Informants and Cooperating Witnesses</u>. Mr. Scilagyi requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case. The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957). Mr. Scilagyi also requests disclosure of any information indicating bias on the part of any informant or cooperating witness. <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Such information would include inducements, favors, payments, or threats made to the witness to secure cooperation with the authorities.

(22) <u>Expert Witnesses</u>. The defendant requests disclosure of any expert witnesses the government intends to call at trial and "a written summary of testimony that the government intends to use," including the "witnesses' opinions, the bases and the reasons for those opinions" and his or her qualifications. Fed. R. Crim. P. 16(a)(1)(E).

(23) <u>Residual Request</u>. The defense intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. This request specifically includes all subsections of Rule 16. Mr. Scilagyi

requests that the government provide him and his attorney with the above requested material sufficiently in advance of trial.

### IV.

### REQUEST FOR LEAVE TO FILE FURTHER MOTIONS

To date, Mr. Scilagyi and defense counsel have received limited discovery from the government. It is anticipated that as new information comes to light, the defense will likely find it necessary to file further motions. Therefore, it is requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

### V.

### CONCLUSION

For the reasons stated above, Mr. Scilagyi moves this Court to grant his motions.

Respectfully submitted,

Dated: March 18, 2008

/s/ Norma A. Aguilar
**NORMA A. AGUILAR**
Attorney for Mr. Scilagyi
norma_aguilar@fd.org